UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 24-30664-AEC |
| MEREDITH SLAYDEN DILLARD | ) | |
| MATTHEW DENNIS DILLARD, | ) | CHAPTER 11 |
| | ) | |
| Debtors | ) | (Subchapter V) |
| | ) | |

CHAPTER 11 PLAN OF REORGANIZATION SUBMITTED BY
MEREDITH SLAYDEN DILLARD AND MATTHEW DENNIS DILLARD,
DEBTORS AND DEBTORS IN POSSESSION

March 18,  2025

Filed by:

Meredith Slayden Dillard and Matthew Dennis Dillard,
Debtors and Debtors in Possession

Attorneys for Debtors:
G. Frank Nason, IV
Georgia Bar No. 535160
LAMBERTH, CIFELLI,
 ELLIS & NASON, P.A.
6000 Lake Forrest Drive, NW
Suite 290
Atlanta, GA 30328
(404) 262-7373

**Introduction**

Pursuant to Title 11 of the United States Code, Meredith Slayden Dillard and Matthew Dennis Dillard ("Debtors"), Chapter 11 debtors and debtors in possession, and pursuant to 11 U.S.C. §§ 1123, 1189, and 1190, hereby submit and propose this *Chapter 11 Plan of Reorganization Submitted by Meredith Slayden Dillard and Matthew Dennis Dillard, Debtors and Debtors in Possession* (the "Plan").

**Article 1
Subchapter V Disclosures**

1.1 <u>Subchapter V Plan of Reorganization</u>. This Plan is filed under Subchapter V of Chapter 11 of the Bankruptcy Code.

1.2 <u>History of Debtors' Business Operations</u>. Matthew Dennis Dillard currently operates Dillard Construction and Services, LLC ("Construction"), which was formed on or about May 9, 2023. Construction is engaged in the business of construction, remodeling, and renovations. In 2023, Construction generated approximately $116,000 in gross revenues. In 2024, Construction generated approximately $120,000 in gross revenues.

The primary non-household related debts in this case were the result of guaranties executed by Debtors in connection with the operation of MTSD, Inc. ("MTSD"). Matthew Dennis Dillard started MTSD in 2011 to provide service to FedEx Ground. MTSD became the Contracted Service Provider of Hart County, GA under an agreement with FedEx Ground (the "Provider Agreement"). In its first year, MTSD grossed approximately $125,000. Over the next ten (10) years, MTSD grew to a 44 truck, 45 employee company with gross sales approaching $5 million. MTSD successfully navigated the COVID pandemic. Unfortunately, Chris Donnley, senior terminal manager for FedEx Ground, targeted MTSD and began taking actions against MTSD, including suspending the rights of the number one delivery driver and limiting assistance from FedEx Ground. These actions, which were without cause, resulted in termination of MTSD as a provider under the Provider Agreement.

Chris Donnley then provided another contractor with the sixteen (16) zip code areas serviced by MTSD (the "New Provider"). At the time, MTSD was liable for payments under vehicle financing agreements totaling approximately $29,000 per month. MTSD negotiated with the New Provider to allow the New Provider to employ MTSD's fleet in exchange for rental payments equal to the amount owed under the vehicle finance agreements.  Chris Donnley, however, prohibited the New Provider from using MTSD's fleet out of terminal ZATH306. Without the rental income, MTSD was forced to surrender its fleet, resulting in the vehicle vendors taking collection actions against MTSD and Debtors. MTSD and Debtors sought legal relief to pursue claims against Chris Donnley and FedEx Ground, but the lawyer failed to timely take action under the Provider Agreement. Chris Donnley was ultimately terminated.

1.3 <u>Liquidation Analysis</u>. Attached as Exhibit "A" is a liquidation analysis. The Plan satisfies the requirements of 11 U.S.C. § 1129(a)(7)(A) as incorporated into § 1191(a).

1.4    <u>Alternative Confirmation Standards under §1191(a) and (b)</u>. Debtors seek to confirm this Plan by obtaining the consent of all Classes provided for in this Plan by a majority in number and two-thirds in amount of Allowed Claims actually voting. If Debtors succeed in obtaining the consent of all Classes, the provisions of the Plan referencing and operating under § 1191(a) of the Bankruptcy Code will apply. If Debtors are unable to obtain the consent of all Classes, Debtors will request the Court to confirm the Plan under § 1191(b). In this case, the provisions of the Plan referencing and operating under § 1191(b) of the Bankruptcy Code will apply.

1.5    <u>Property and Claims</u>. The Plan deals with all the property of Debtors and provides treatment of all Allowed Claims against Debtors and their property.

**Article 2**
**Definitions**

Unless the context requires otherwise, the following terms shall have the respective meanings specified below whenever used in the Plan. Capitalized terms not defined in this Plan have the meanings ascribed to such terms in Title 11 of the United States Code and the Federal Rules of Bankruptcy Procedure. Accounting terms not defined in the Plan shall have the meanings ascribed to such terms in accordance with generally accepted accounting principles currently in effect. Whenever from the context it appears appropriate, terms stated in the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.  The words "herein," "hereof," and "hereunder" and other words of similar import shall refer to this Plan as a whole, including any and all exhibits and schedules to the Plan, as the same may be amended.

"Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Bankruptcy Code and referred to in § 507(a)(2) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses of preserving the estate and administering the Case that arose or accrued or that shall arise or accrue in the ordinary course of business during the period between the Petition Date and the Closing Date; (b) any Professional Fee Claim; and (c) any fee or charge assessed against Debtor under 28 U.S.C. § 1930.

"Allegiant" means Allegiant Partners, Inc.

"Allowed Administrative Claim" means all or that portion of an Administrative Claim to the extent it has been allowed by a Final Order of the Bankruptcy Court.

"Allowed Claim and Allowed . . . Claim" means all or that portion of any Claim, other than an Administrative Claim, against Debtor to the extent that: (a) proof of such Claim has been filed or is deemed filed pursuant to § 1111 of the Bankruptcy Code and is not the subject of an objection filed by the last date set by the Bankruptcy Court for filing objections to Claims; or (b) it has been allowed by this Plan or a Final Order of the Bankruptcy Court after objection pursuant to the procedures established in this Plan for resolution of Disputed Claims. The term "Allowed," when

2

used to modify a reference in the Plan to any Claim or Class of Claims, shall mean a Claim (or any Claim in any such Class) that is so allowed.

"Avoidance Action" means any claim or right arising out of or maintainable pursuant to §§510, 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether any action to assert such claim or right has been commenced or asserted prior to the Effective Date.

"Bank of America" means Bank of America, N.A.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, as applicable to the Bankruptcy Case.

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Georgia, Athens Division.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as applicable from time to time to the Case.

"Business Day" means a day on which commercial banks in Georgia are not required or authorized by law to be closed.

"Case" means Debtors' Chapter 11 bankruptcy case.

"Cash" means lawful currency of the United States and its equivalents, provided, however, that any distributions under this Plan will be deemed to be made in Cash if made by check drawn on any United States bank, or by wire transfer.

"Causes of Action" shall include any (i) claims for breach of contract or commercial tort claims against Federal Express, Kimberly Whigham, Chris Donley, Jim French, and Will Clark, and (ii) any legal malpractice claims against Laura Vickery, all as identified in response to Question 74 of Schedule A/B. Causes of Action shall not include Avoidance Actions.

"Claim" means a claim, as defined in § 101(5) of the Bankruptcy Code, against Debtors.

"Claims Bar Date" means: (a) with respect to Administrative Claims (other than Professional Fee Claims) that accrued or were incurred during the period commencing after the Petition Date but prior to the Confirmation Date, the first Business Day that is thirty (30) days after the Effective Date, and (b) with respect to a General Unsecured Claim, February 26, 2025.

"Class" means a class of Claims as defined in this Plan.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Hearing" means the duly noticed hearing held by the Bankruptcy Court pursuant to § 1128 of the Bankruptcy Code to consider confirmation of this Plan, as may be adjourned by the Court from time to time without further notice other than announcement of the adjourned date of the Confirmation Hearing at such hearing.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan.

"Court" means the Bankruptcy Court or any other Court of the United States with authority over the Case or, with respect to any particular proceeding arising under or related to the Case, any other Court that is exercising jurisdiction over such proceeding.

"Creditor" means the Holder of a Claim against a Debtor.

"Debtors" mean Meredith Slayden Dillard and Matthew Dennis Dillard.

"Default Notice" means the notice and opportunity to cure provided in Article 5.3 of the Plan.

"Debtors' Counsel" means Lamberth, Cifelli, Ellis & Nason, P.A.

"Designated Notice" means notice and an opportunity for a hearing as described in § 102(a) of the Bankruptcy Code.  Following entry of the Confirmation Order, the time for the giving of any notice (other than a Default Notice) shall be reduced to twenty (20) days, and notice shall be limited to the Notice Parties. When a party gives Designated Notice and no written objection is served within 20 Business Days of service, the party to whom Designated Notice is given shall be presumed to have consented to or have no opposition to the relief or request identified in the Designated Notice. If a timely objection is served, the Court will hold a hearing on the objection on no less than five (5) days' notice.

"Disputed Claim or Disputed . . . Claim" means a Claim that (a) is not an Allowed Claim or (b) is the subject of an objection and that has not been allowed or disallowed by a Final Order.

"Distribution" means a distribution of Cash to a Claimant on account of an Allowed Claim pursuant to the terms of this Plan.

"Distribution Date" means any date on which distributions of Cash are to be made from the Distribution Fund.

"Effective Date" means the first day that is fourteen (14) Business Days after the Confirmation Date.

"Final Decree" means a Final Order of the Bankruptcy Court closing the Case.

"Final Order" means an order or judgment of a Court (including one approving a settlement) is entered on the docket which: (a) shall not have been reversed, stayed, modified or amended and as to which the time to appeal from, or to seek review or rehearing of, shall have

4

expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (b) if appealed from, shall have been affirmed (or the appeal dismissed) and the time to appeal from such affirmance or to seek review or rehearing thereof shall have expired, or no further hearing, appeal or petition for certiorari can be taken or granted.

"General Unsecured Claim" means a Claim against one or both of the Debtors arising on or before the Petition Date that is not an Allowed Secured Claim, Administrative Claim or Priority Tax Claim.

"Holder" means the beneficial owner of any Claim.

"Infiniti" means the 2020 Infiniti QX30 owned by Matthew Dennis Dillard.

"IRS" means the Internal Revenue Service.

"Judgment Lien" means a Lien held by a Creditor with an Allowed Claim arising from a judgment against Meredith Slayden Dillard, Matthew Dennis Dillard, or both and attaches to the Residence.

"Lien" means any mortgage, lien, pledge, charge, security interest, encumbrance or other legally cognizable security device of any kind affecting or attaching to property of the estate.

"Mitsubishi" means Mitsubishi HC Capital America, Inc.

"NAPREC" means NAPREC II, LLC, assignee of Unifi Equipment Finance, Inc.

"Notice Parties" means (i) with respect to notices served Debtors, the U.S. Trustee, the Subchapter V Trustee (unless terminated in accordance with § 1183(c) of the Bankruptcy Code), and all other parties in interest who, after entry of the Confirmation Order, have filed a request for notice with the Clerk of the Court and have served same on Debtors' counsel, or (ii) with respect to notices served by a party other than Debtors, Debtors and their counsel, the U.S. Trustee, the Subchapter V Trustee (unless terminated in accordance with § 1183(c) of the Bankruptcy Code), and all other parties in interest who, after entry of the Confirmation Order, have filed a request for notice with the Clerk of the Court and have served same on Debtors' counsel.

"Petition Date" means December 18, 2024.

"Plan" means this plan proposed by Debtors, as it may be amended or modified from time to time, including all exhibits and reports annexed hereto or referenced herein.

"PNC Bank" means PNC Bank, National Association, in its capacity as the Holder of Allowed Secured Claim on the Residence.

"PNC Credit Card" means PNC Bank, National Association, in its capacity as the Holder of an Allowed Unsecured Claim arising from credit card ending in 3774.

"Post-Confirmation Administrative Claims" means costs and expenses incurred, after the Confirmation Date, in connection with administration and consummation of this Plan, including, without limitation, Post-Confirmation Professional Fee Claims.

"Post-Confirmation Debtors" means Meredith Slayden Dillard and Matthew Dennis Dillard following entry of the Confirmation Order.

"Post-Confirmation Professional Fee Claims" means Post-Confirmation Administrative Claims for compensation earned, and reimbursement of expenses incurred, by attorneys, accountants, or other professionals employed by Post-Confirmation Debtors.

"Priority Tax Claim" means a Claim that is entitled to priority under § 507(a)(8) of the Bankruptcy Code.

"Professional Fee Claims" means Claims for compensation earned and reimbursement of expenses of attorneys, accountants, or other professionals employed by Debtors, with approval of the Bankruptcy Court.

"Residence" means the real property and improvements thereon with the common address of 1620 Coneflower Lane, Statham, Oconee County, Georgia 30666.

"Schedules" means the schedules of assets and liabilities and any amendments thereto filed by Debtors in accordance with § 521 of the Bankruptcy Code.

"Subchapter V Trustee" means Jenny Martin Walker, the duly appointed trustee pursuant to § 1183(a) of the Bankruptcy Code.

"Unclaimed Property" means any funds payable to Holders of Claims that are unclaimed. Unclaimed Property shall include (a) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (b) funds for checks which have not been presented and paid within ninety (90) days of their issuance, and (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a proper address to mail or deliver such property.

"Unpaid Claims Reserve" means the reserve created pursuant to Section 6.5 of the Plan.

"U.S. Trustee" means the United States Trustee for Region 21, and the office of such United States Trustee.

"Wintrust" means Wintrust Specialty Finance, a division of Beverly Bank & Trust Company.

**Article III**
**Treatment of Unclassified Claims;**
**Treatment of Executory Contracts and Unexpired Leases**

Pursuant to § 1122 of the Bankruptcy Code, certain Claims are unclassified.  Unclassified Claims are treated as follows:

3.1      Administrative Claims.  Allowed Administrative Claims are not classified in this Plan and are treated as follows:

(a)      Payment of Allowed Administrative Claims.  Holders of Allowed Administrative Claims other than Professional Fee Claims will be paid in full in cash as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof. Other than Professional Fee Claims, which may be filed at any time prior to entry of a Final Decree, any request for payment of an Administrative Claim arising on or before the Confirmation Date must be filed no later than the Claims Bar Date or such Administrative Claim will be forever barred. Debtor shall have the right to object to the allowance of any Administrative Claim.

(b)      Payment of Professional Fee Claims. Professional Fee Claims with regard to the period prior to entry of the Confirmation Order shall be paid in the amount awarded pursuant to orders of the Bankruptcy Court and shall be paid in full in Cash as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof. Debtor's counsel holds an unused retainer in the amount of $33,262.00 and anticipates a Professional Fee Claim in an amount not likely to exceed the retainer.

(c)      Compensation of Subchapter V Trustee. The Subchapter V Trustee shall be entitled to apply for reasonable compensation for the Subchapter V Trustee's fees and expenses under 11 U.S.C. §§ 330 and 503(b)(3). Beginning in February of 2025, Debtors transferred to the Subchapter V Trustee the sum of $1,000 per month to be applied against allowed Subchapter V Trustee's fees. Debtors shall pay any unpaid portion of allowed compensation owed to the Subchapter V Trustee in full on the day after the order on the Subchapter V Trustee's application for compensation becomes a Final Order, or upon such other terms as may be agreed upon by Debtors and the Subchapter V Trustee.

3.2      Priority Tax Claims. There are no Priority Tax Claims owed by Debtors.

3.3      Treatment of Other Certain Unclassified Claims. Other unclassified Claims are treated as follows:

(a)      Post-Confirmation Administrative Claims. Post-Confirmation Administrative Claims, other than Post-Confirmation Professional Fee Claims, shall be paid as the same come due, without the necessity of Bankruptcy Court approval. Upon motion

7

of any party in interest, the Bankruptcy Court may review any payment of such Post-Confirmation Administrative Claims and, if appropriate, order the return or refund of any such payment. Post-Confirmation Professional Fee Claims shall be subject to review by the Notice Parties. A party seeking payment of a Post-Confirmation Professional Fee Claim shall serve its invoice on the Notice Parties. Unless one or more of the Notice Parties files an objection with the Bankruptcy Court within fourteen (14) days of the receipt of the invoice, Debtor shall be fully authorized without an order of the Bankruptcy Court to pay one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred.  If an objection is filed, then Debtor shall still be fully authorized without an order of the Bankruptcy Court to pay one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred that are not the subject of an objection. The Bankruptcy Court shall retain jurisdiction over any objections to such fees and expenses that are filed and shall be authorized to determine whether to allow any disputed Post-Confirmation Professional Fee Claims following a hearing on no less than ten (10) days' notice to the parties to the dispute.

3.4    <u>Treatment of Executory Contracts and Unexpired Leases</u>. There are no executory contracts or unexpired leases.

## Article IV
## Classification and Treatment of Claims and Interests; Impairment

Claims are treated as set forth below.  A Claim shall be deemed classified in a particular Class only to the extent that (a) the Claim is included within the description of that Class, and (b) the Claim is not included in any other Class.  To the extent that any portion or remainder of the Claim qualifies within the description of a different Class, that portion of the Claim shall be classified in that different Class.  A Claim is classified in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been satisfied, disallowed or extinguished before the Effective Date of the Plan.

4.1    <u>Class 1A (PNC Bank)</u>. Class 1A shall consist of the Allowed Secured Claim of PNC Bank, which holds (i) a first priority Lien on the Residence to secure a debt for which PNC Bank filed Proof of Claim No. 7 in the amount of $292,397.36, and (ii) a second priority Lien on the Residence to secure a debt for which PNC Bank filed Proof of Claim No. 10 in the amount of $44,381.05. Debtors' obligations with respect to PNC Bank under their loan documents shall remain unaltered and in full force and effect as to Debtors, shall not be modified by confirmation of the Plan, and shall survive any discharge entered in this Case, except as provided in 11 U.S.C. § 1124(2). In the event of default under the Plan, PNC Bank will be authorized to exercise its rights under the loan documents and applicable nonbankruptcy law.

4.3    <u>Class 1B (Bank of America)</u>. Class 1B shall consist of the Allowed Claim of Bank of America, which holds a Lien on the Infiniti to secure a debt for which Bank of America filed Proof of Claim No. 2 in the amount of $16,634.99 (the "BOA Debt"). Following Confirmation, Bank of America shall retain its Lien on the Infiniti. The BOA Debt shall be amortized over three (3) years at the rate of Seven and One-Half Percent (7.5%) per annum payable in monthly

installments in the approximate amount of $517.45 per month beginning on the first Business Day of the first complete month following the Effective Date and continuing on a like day of every month thereafter until paid in full. In the event of default under the Plan, Bank of America may provide Default Notice in accordance with Article 5.3 of the Plan.

      4.4    <u>Class 1C (Wintrust)</u>. Class 1C shall consist of the Allowed Claim of Wintrust, which holds a Judgment Lien against the Residence to secure a debt for which Wintrust filed Proof of Claim No. 6 in the amount of $26,303.75 (the "Wintrust Debt"). Following Confirmation, Wintrust shall retain its Judgment Lien on the Residence. The Wintrust Debt shall be amortized over five (5) years at the rate of Six Percent (6%) per annum payable in monthly installments in the approximate amount of $508.51 per month beginning on the first Business Day of the first complete month following the Effective Date and continuing on a like day of every month thereafter until paid in full. In the event of default under the Plan, Wintrust may provide Default Notice in accordance with Article 5.3 of the Plan. Nothing herein shall prohibit Debtors from prepaying the Wintrust Debt as long as such payment does not interfere with payments to other Creditors under the Plan.

      4.5    <u>Class 1D (Mitsubishi)</u>. Class 1D shall consist of the Allowed Claim of Mitsubishi, which holds a Judgment Lien against Matthew's interest in the Residence to secure a debt for which Mitsubishi filed Proof of Claim No. 4 in the amount of $110,577.05 (the "Mitsubishi Debt"). Following Confirmation, Wintrust shall retain its Judgment Lien on Matthew's interest in the Residence. The Mitsubishi Debt shall be amortized over ten (10) years at the rate of Six Percent (6%) per annum payable in monthly installments in the approximate amount of $1,283.29 per month beginning on the first Business Day of the first complete month following the Effective Date and continuing on a like day of every month thereafter until paid in full. In the event of default under the Plan, Mitsubishi may provide Default Notice in accordance with Article 5.3 of the Plan. Nothing herein shall prohibit Debtors from prepaying the Mitsubishi Debt as long as such payment does not interfere with payments to other Creditors under the Plan.

      4.6    <u>Class 2A (Allegiant and PNC Credit Card)</u>. Class 2A shall consist of the (i) Allowed Claims of Allegiant, which filed Proof of Claim No. 5 against both Debtors in the amount of $55,564.56, and (ii) PNC Credit Card, which filed Proof of Claim No. 9 against Debtor Meredith Slayden Dillard in the amount of $8,366.67. The Holders of Class 2A Allowed Claims shall be paid in full, without interest, in monthly installments beginning on the first Business Day of the first complete month following the Effective Date and continuing on a like day of every month thereafter until paid in full, as follows: Allegiant - $926.08 monthly installment and PNC Credit Card - $139.44 monthly installment. In the event of default under the Plan, the Holders of Class 2A Claims may provide Default Notice in accordance with Article 5.3 of the Plan. Nothing herein shall prohibit Debtors from prepaying Class 2A Claims as long as such payment does not interfere with payments to other Creditors under the Plan.

      4.7    <u>Class 2B (Other Unsecured Claims)</u>. Class 2B shall consist of all Allowed Claims against Debtor Matthew Dennis Dillard not included in any other Class, to wit: (i) Discover Bank, which filed Proof of Claim No. 1 in the amount of $27,780.66, (ii) Falcon Equipment Finance, which filed Proof of Claim No. 3 in the amount of $110,531.14, (iii) Mercedes-Benz Financial Services USA, LLC, which filed Proof of Claim No. 5 in the amount of $7,647.15, and (iv)

SYNCB/Lowes which a scheduled debt in the amount of $4,000. Distributions to Holders of Class 2B Claims shall be paid in ten (10) semi-annual payments as follows: Beginning on the first Business Day that is six (6) months from the Effective Date and continuing on a like day every six (6) months thereafter, Holders of Allowed Class 2B Other Unsecured Claims shall receive a Pro Rata share of Debtors' projected disposable income as set forth on attached Exhibit "B" (the "PDI"). In the event of default under the Plan, the Holders of Class 2B Claims may provide Default Notice in accordance with Article 5.3 of the Plan. Nothing herein shall prohibit Debtors from prepaying Class 2B Claims as long as such payment does not interfere with payments to other Creditors under the Plan.

4.8    Class 3 (Debtors). Class 3 shall consist of the Debtors.

4.9    Impairment. All Classes are impaired and eligible to vote, except Classes 1A and 3.

## Article V
## Means for Execution of the Plan

5.1    Funding of the Plan. Funds for payments under the Plan will be from revenues generated by Matthew Dennis Dillard's operation of Dillard Construction and Services, LLC, and Meredith Slayden Dillard's salary.

5.2    Property of the Estate. Property of the estate shall remain in control of Debtors and shall be free and clear of Liens, except as otherwise provided in Article 4 of the Plan. Confirmation of the Plan shall divest all Creditors of all Liens and Judgment Liens not specifically preserved herein.

5.3    Events of Default. Unless otherwise specifically provided in a class under the Plan, in the event of a default by Debtors in payments under the Plan or otherwise, the Holder must send written notice ("Default Notice") to Debtors at the addresses of record for Debtors as reflected on the docket for this Bankruptcy Case, unless Debtors have provided the Holder with a written notice of a change of address. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default, as well as notice that Debtors have fifteen (15) days (in the case of a monetary default) and thirty (30) days (in the case of a non-monetary default) from receipt by Debtors and Debtors' counsel of the Default Notice (or the following Business Day if the 15th or 30th day does not fall on a business day) to cure such default (and the address for payment, which will accept overnight deliveries, in the event of a monetary default). The Holder must send such Default Notice to Debtors via certified mail or recognized overnight carrier with a copy via email or fax and certified mail to G. Frank Nason, IC (Lamberth, Cifelli, Ellis & Nason, P.A.) at the address reflected in the then current directory of the State of Bar of Georgia. In the event the Plan is confirmed under 1191(b), the Holder must also provide a copy of the Default Notice to the Subchapter V Trustee at the address reflected on the case docket. Debtors shall have fifteen (15) days or thirty (30) days (as applicable) from Debtors' and Debtors' counsel's receipt of the Default Notice to cure such default. Receipt by Debtors' Counsel or the Subchapter V Trustee shall not be deemed receipt by Debtors of the required Default Notice. Notwithstanding anything to the contrary in the Plan or otherwise, a default under

one Class of Claims or sub-class of Claims shall not constitute a default under any other Class of Claims or sub-class of Claims. (For example a default under Class 1 shall not constitute a default under Class 2). Upon failure to cure a default under this section, the creditor to whom Debtors have defaulted may pursue their claim, as provided for in the Plan, in either bankruptcy court and/or state court. If a creditor/claimant is successful in obtaining a judgment against Debtors based on their class treatment, the creditor may seek relief from the automatic stay if the Plan was confirmed under 1191(b).

     5.4    <u>Objections to Claims</u>. Debtors may file objections no later than ninety (90) days after the Effective Date. All objections shall be resolved by the Bankruptcy Court unless settled as provided herein. Any objection to a Claim may be settled after the settling parties provides Designated Notice of the proposed settlement and there are no timely objections, and such Claim shall become an Allowed Claim without (i) further notice to any parties, and (ii) without the approval of the Bankruptcy Court. In the event of an objection, the Bankruptcy Court shall resolve the objection after notice and hearing.

     5.5    <u>Setoff Rights</u>.  Debtors may, but shall not be required to, setoff against any Claim, to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which Debtors may have against the Holder of such Allowed Claim, but neither the failure to do so nor the allowance of any Allowed Claim hereunder shall constitute a waiver or release of any such claim Debtors may have against such Holder. Nothing herein shall be construed to extend any statute of limitations provided by applicable law or to prevent Debtor from filing an action.

     5.6    <u>No Prosecution of Avoidance Actions.</u> Debtors will not pursue Avoidance Actions.

     5.7    <u>Causes of Action</u>. Debtors shall retain all Causes of Action and preserve the right to initiate any proceeding in any court with subject matter jurisdiction. If Debtors pursue any Causes of Action, any recovery (after the all costs of prosecution, including but not limited to attorneys' fees, accountant fees, expert witness fees, deposition costs, court costs, and similar charges) shall be held in a segregated account to be known as the Litigation Fund and shall be held in escrow for the sole and exclusive benefit of those parties entitled to Distributions therefrom. The Litigation Fund may from time to time be invested in short term certificates of deposit, short term treasury bills, or money market accounts, provided that such deposits or investments comply with the requirements of 11 U.S.C. § 345. All interest earned shall be retained in the Litigation Fund.

     In addition to the disbursements of PDI as provided in Article 4.8, the Holders of Allowed Class 2B Claims shall receive a Pro Rata share of the funds in the Litigation Fund until such Holders receive the amount of their Allowed Claims. Thereafter, all funds in the Litigation Fund shall be retained by Debtors.

     5.8    <u>Employment of Professionals</u>. Debtor may employ the professionals employed by Debtors prior to the Confirmation Date. Debtors shall be entitled to employ such additional professionals as may be necessary after the Confirmation Date.

5.9     <u>Subchapter V Trustee</u>. The Subchapter V Trustee was appointed by the U. S. Trustee in this case to perform the duties described in section 1183(b) of the Bankruptcy Code, one of which is to facilitate the development of a consensual plan of reorganization. The services of the Subchapter V Trustee shall terminate upon "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code. Debtors shall directly make all payments required under this Plan, including the first payments required for substantial consummation of the Plan.

**Article VI**
**Distributions**

6.1     <u>Distributions</u>.  Unless otherwise provided for herein, all Distributions under this Plan shall be made by Debtors.

6.2     <u>Distributions of Cash</u>. Any Distribution of Cash made by Debtors pursuant to this Plan shall, at Debtors' option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank or in any other form of cash or cash equivalent.

6.3     <u>No Interest on Claims or Interests</u>. Unless otherwise specifically provided for in this Plan, the Confirmation Order, no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final determination is made when and if such Disputed Claim becomes an Allowed Claim.

6.4     <u>Delivery of Distributions</u>. The Distribution to a Holder of an Allowed Claim shall be made by Debtors (a) at the address set forth on the Proof of Claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtors after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Debtors have not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to Debtors' books and records.

6.5     <u>Unclaimed Property</u>.  Unclaimed Property is treated as follows:

(a)     Unclaimed Property shall be deposited in the Unpaid Claims Reserve to be held in trust for the benefit of the Holders of Allowed Claims entitled thereto under the terms of the Plan. For a period of ninety (90) days after a Distribution is made to a Creditor on account of which Unclaimed Property first results (said period being hereinafter referred to as the "Claiming Period"), Unclaimed Property shall be held in the Unpaid Claims Reserve solely for the benefit of the Holders of Allowed Claims which have failed to claim such property. During the Claiming Period, Unclaimed Property due the Holder of an Allowed Claim shall be released from the Unpaid Claims Reserve and delivered to such Holder upon presentation of proper proof by such Holder of its entitlement thereto. In the event that there is Unclaimed Property in the Unpaid Claims Reserve with regard to any Claim, Debtors shall, until such Unclaimed Property is claimed or the Claiming Period with regard to the Holder of such Claim has expired, make all subsequent Distributions due with regard to such Claim to the Unpaid Claims Reserve.  After the Claiming Period with regard

12

to such Holder has expired, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being disallowed, waived, and satisfied.

(b)      At the end of the Claiming Period, the Holder of an Allowed Claim theretofore entitled to Unclaimed Property shall cease to be entitled thereto.

(c)      The Unpaid Claims Reserve may be maintained in an interest bearing account. No Holder entitled to funds from the Unpaid Claims Reserve shall be entitled to interest with regard to the amounts due.

6.6    Disputed Claims.  In the event that an objection to a Claim is pending so that the Claim is a Disputed Claim, Debtors shall not make any Distributions on account of such Claim until the Claim is an Allowed Claim. Once a Disputed Claim becomes an Allowed Claim, Debtor shall pay on account of such Allowed Claim all Distributions to which such Allowed Claim would have been entitled had the Claim been an Allowed Claim when such Distributions were payable.

6.7    Fractional Dollars. Any other provision of this Plan notwithstanding, Debtors shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, at Debtors' option the actual payment may reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

6.8    De Minimis Payments.  Reorganized Debtors will not issue payments under this Plan on account of any Claim for which the Distribution would equal $15.00 or less.

### Article VII
### Implementation of the Plan

7.1     Revesting of Assets. All of the property of the estate shall vest with Debtors on the Effective Date free and clear of Liens, except as specifically provided herein.

7.2     Treatment of NAPREC. NAPREC ostensibly holds a Judgment Lien against the Residence. NAPREC was scheduled as Contingent, Unliquidated, and Disputed and failed to file a Proof of Claim. Accordingly, NAPREC's Claim is fixed at Zero Dollars ($0). Confirmation of the Plan shall operate to satisfy, discharge, and release the Allowed Claim of NAPREC.

7.3     Joint and Several Liability.  Confirmation of the Plan shall not affect the joint and several liability of any co-defendant, co-obligor, guarantor, or other entity that may be liable with Debtors, and such liability shall continue unabated to the extent of applicable non-bankruptcy law. Nothing herein shall be deemed to affect any right of subrogation to which any guarantor may be entitled under applicable non-bankruptcy law.

7.4     Temporary Injunction. The Confirmation Order shall operate as an injunction against any acts against Debtors and their property to initiate, prosecute, enforce, liquidate, collect or otherwise assert any Claim against Debtors and its property except as provided in this Plan. Any act in violation of this provision shall be null and void.

13

**Article VIII**
**Effect of Confirmation; Discharge**

8.1    <u>Effect of Confirmation; Continuation of Stay</u>. Except as otherwise provided in the Plan or in the Confirmation Order, this Plan upon entry of the Confirmation Order shall be binding on all parties in interest, regardless of whether the Claims are impaired and regardless of whether the Holders have accepted the Plan.

8.2    <u>Discharge</u>.

(a)    <u>Discharge if Plan Confirmed Under Section 1191(a).</u> If this Plan is confirmed pursuant to 11 U.S.C. § 1191(a), Debtors shall be discharged from any debts that arose before Confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in 11 U.S.C. §1141(d).

(b)    <u>Discharge if Plan Confirmed Under Section 1191(b).</u> If the Plan is confirmed under 11 U.S.C. § 1191(b), as soon as practicable after completion by Debtors of the payment due under the Plan, unless the Bankruptcy Court approves a written waiver of discharge executed by Debtors after the order for relief under this chapter, the Court shall grant Debtors a discharge of all debts provided in 11 U.S.C. §1141(d)(1)(A), and all other debts under 11 U.S.C. § 503 provided for in this Plan, except any debt (i) on which the last payment is due after the first 3 years of the Plan, or such other time not to exceed 5 years fixed by the Court, or (2) if applicable, of the kind specified in 11 U.S.C. § 523(a).

**Article IX**
**Retention of Jurisdiction**

9.1    Notwithstanding confirmation of this Plan or the Effective Date having occurred, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)    The determination of the allowability of Claims upon objection to such Claims by any party;

(b)    Determination of any objections to requests for payment of Administrative Claims, including Professional Fee Claims;

(c)    Resolution of controversies and disputes regarding the interpretation and implementation of this Plan, including the determination of defaults under the Plan;

(d)    Implementation of the provisions of this Plan and entry of orders in aid of confirmation of this Plan;

14

(e)      Determination of any tax liabilities pursuant to Section 505 of the Bankruptcy Code.

9.2      In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then such matter shall be heard and determined by the District Court for the Middle District of Georgia (the "District Court").  If the District Court does not have jurisdiction, then the matter may be brought before any Court having jurisdiction with regard thereto.

9.3      <u>Final Decree</u>. If the Plan is confirmed under 1191(a), the Bankruptcy Court may, upon application of Debtors, at any time after "substantial consummation" of the Plan as defined in section 1101(2) of the Bankruptcy Code, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing these case pursuant to section 350 of the Bankruptcy Code, provided, however, that: (a) Debtors shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Bankruptcy Case if appropriate for any of the following purposes: (1) administering assets; (2) entertaining any adversary proceedings, contested matters or applications Debtor has brought or brings with regard to administering the Plan; (3) enforcing or interpreting this Plan or supervising its implementation; or (4) for other cause. If the Plan is confirmed under 1191(b), the Bankruptcy Court may, upon application of Debtors, at any time after completion of Plan payments, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest.

## Article X
## Modification of the Plan

Debtors shall be allowed to modify this Plan pursuant to 11 U.S.C. § 1193 to the extent applicable law permits. Debtors may modify the Plan at any time before the Confirmation Hearing by filing the modification with the Court. Debtors may modify the Plan upon a showing that circumstances warrant such a modification and after a notice and hearing. If the Plan was confirmed under 11 U.S.C. § 1191(a), any holder of a claim or interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the plan as modified, unless, within the time fixed by the Court, such holder changes its previous acceptance or rejection. If the Plan has been confirmed under 11 U.S.C. § 1191(b), Debtors may modify the Plan upon a showing the circumstances warrant such a modification and after a notice and hearing.

## Article XI
## Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Interests, or within each Class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events

subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only. No specific tax consequences to any Creditor or Holder of an Interest are represented, implied, or warranted. Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation. DEBTORS ASSUME NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

**Article XII**
**Request for Confirmation Pursuant to § 1191**

In the event that all requirements for confirmation are met except the provisions of 11 U.S.C. § 1129(a)(8) of the Bankruptcy Code, Debtors request that the Plan be confirmed pursuant to 11 U.S.C. § 1191(b) of the Bankruptcy Code.

Dated: March  18, 2025

*/s/      Meredith Slayden Dillard*
Meredith Slayden Dillard

*/s/      Mathew Dennis Dillard*
Matthew Dennis Dillard

LAMBERTH, CIFELLI,
ELLIS & NASON, P.A.
*Counsel for Debtors*

By: */s/ G. Frank Nason, IV*
G. Frank Nason, IV
Georgia Bar No. 535160
fnason@lcenlaw.com

6000 Lake Forrest Drive, NW
Suite 290
Atlanta, Georgia 30328
(404) 262-7373

**Exhibit "A"**

**Liquidation Analysis**

## Liquidation Analysis

### Debt Analysis

There are two separate estates – one for Meredith Slayden Dillard ("Meredith") and one for Matthew Dennis Dillard ("Matthew"). Jointly liable debts are claims against each estate. Claims solely against Meredith's estate are not claims against Matthew's estate. Claims solely against Matthew's estate are not claims against Meredith's estate. Accordingly, each estate has its own liquidation analysis.

The following are jointly liable debts against both estates:

(1) PNC Bank, N.A. – first priority security deed on the residence at 1620 Coneflower Lane, Statham, Georgia 30666 (the "Residence") – Proof of Claim No. 7 - $292,397.36 (prepetition escrow shortfall - $156.74);

(2) PNC Bank, N.A. – second priority security deed on the Residence – Proof of Claim No. 10 - $44,381.05;

(3) Wintrust Specialty Finance – Writ of Fi. Fa. - Proof of Claim No. 6 - $26,303.75; and

(4) Allegiant Partners, Inc. – Proof of Claim No. 5 - $55,564.56 (Unsecured).

The following are debts solely against Meredith's estate:

(1) PNC Bank, National Association – Credit Card  - Proof of Claim No. 9 - $8,366.67

The following are debts solely against Matthew's estate:

(1) Mitsubishi HC Capital America, Inc. – Writ of Fi. Fa. – Proof of Claim No. 4 - $110,577.05;

(2) Bank of America -  Secured by 2020 Infiniti QX80 – Proof of Claim No. 2 - $16,634.99;

(3) Discover Bank – Credit Card – Proof of Claim No. 1 - $27,780.66 (Unsecured);

(4) Falcon Equipment Finance – Guaranty – Proof of Claim No. 3 - $110,531.14

(Unsecured);

(5) Mercedes-Benz Financial Services USA, LLC – Guaranty - Proof of Claim No. 8 -

$7,647.15 (Unsecured); and

(6) SYNCB/Lowes – Credit Card  - Scheduled - $4,000.00.

**Asset Analysis**

| Asset | Debtor | Value | Exemption | | Liquidation |
|---|---|---|---|---|---|
| Residence | Joint | $820,000[1] | $32,000 | | $780,000 |
| Infiniti QX80 | Matthew | $20,000 | NA | | $18,000 |
| BMW X5 | Matthew | $15,000 | $5,000 | | $8,500 |
| Household Goods | Joint | $1,200 | $1,200 | | $0 |
| Electronics | Joint | $2,500 | $2,500 | | $0 |
| Sports Equipment | Joint | $150 | $150 | | $0 |
| Firearm | Joint | $150 | $150 | | $0 |
| Clothing | Joint | $500 | $500 | | $0 |
| Funds in Account | Joint | $100 | NA | | $100 |
| Tax Refunds | Joint | $12,430 | $8,550 | | $3,880 |
| MTSD, Inc. | Matthew | $0 | NA | | $0 |
| Dillard Construction and Services, LLC | Matthew | Unknown | $100 | | $0 |
| M and M and M Partnership | Meredith | $1.00 | $1 | | $0 |

---

[1] Debtor's scheduled the residence at $850,000. The tax commissioner's office assessed the residence's value at $772,698.

| Slayden Brothers Partnership, Ltd. | Meredith | $100 | $100 | | $0 |
| S & B Partnership | Meredith | $100 | $100 | | $0 |
| Commercial Tort Claims | Matthew | Unknown | NA | | $0 |

## Liquidation Analysis

In a Chapter 7 liquidation, the primary asset to be sold would be the Residence:

Sale Price -            $780,000

Costs of Sale -          $101,550 (see below)

      Commissions -       $46,800 (6%)

      Closing Costs -       $2,500

      Prorations -           $2,500

      Trustee  -             $42,250 (11 U.S.C. § 326(a))

      Professionals  -       $7,500

Joint Secured Debts    $363,082 (see below)

      PNC Bank -            $336,778

      Wintrust -             $26,304

Net Recovery -          $315,368 ($157,684 for Meredith and $157,684 for Matthew)

In a Chapter 7, the trustee would not administer the Infiniti QX30, as the secured debt of Bank of America and the cost of sale would not generate any funds for unsecured creditors. The BMW X5 would be included in Matthew's estate. The net nonexempt portion of the tax refund would be allocated $1,940 to Meredith and $1,940 to Matthew. The trustee would not likely pursue any commercial tort claims. The trustee would not likely pursue any Chapter 5 actions, as the

monthly mortgage payments to PNC Bank were the only payments made during the 90 days prior

to the Petition Date.

| Meredith's Estate | Matthew's Estate |
|---|---|
| $157,684 (Residence), plus $1,940 (tax refund) = $159,624 | $157,684 (Residence), plus $1,940 (tax refund), plus $8,500 (BMW) = $168,124 |
|  | Mitsubishi - $110,577 |
| Exemption - $16,000 | Exemption - $16,000 |
| Net - $143,624 | Net - $41,547 |
| Total Debts - $63,931.23 (Allegiant and PNC Credit Card) | Total Debts  - $149,958 (Discover, Mercedes-Benz, Falcone, and Lowes) |
| Recovery to Unsecured- 100% | Recovery to Unsecured – 27.70% |

**Exhibit "B"**

**Projected Disposable Income**

**Projected Disposable Income**

**Income –**

| | |
|---|---|
| Meredith Salary - | $4,840 per month ($1,117 take-home per week) |
| Matthew Business - | $8,000 (estimated) |
| **Total** | **$12,840** |

**Household Expenses**

| | |
|---|---|
| PNC (Class 1A) - | $2,756 |
| Utilities - | $1,280 |
| Car Insurance - | $590 |
| Life Insurance - | $170 |
| Health Insurance – | $938 |
| Food and Housekeeping - | $1,200 |
| Medical and Dental - | $1,080 |
| Transportation - | $250 |
| Miscellaneous | $500 |
| **Total** | **$8,764** |

**Plan Payments**

| | |
|---|---|
| Class 1B (Bank of America)  - | $518 |
| Class 1C (Wintrust)    - | $509 |
| Class 1D (Mitsubishi) - | $1,228 |
| Class 2A - | $1,065 |
| **Total** | **$3,320** |

| | |
|---|---|
| PDI | $756 |